FRANCES GAINES, Respondent, *v.* OWEN P. JACOBSEN, Appellant.

First Department, February 16, 1954.

*Barent Ten Eyck* of counsel (*McNutt & Nash,* attorneys), for appellant.

*Ira M. Millstein* of counsel (*Jacob F. Raskin* with him on the brief; *Weil, Gotshal & Manges,* attorneys), for respondent.

BREITEL, J.   The question in this case is whether a former wife is entitled to a resumption of periodic payments for her support and to the maintenance of life insurance for her benefit under a separation agreement.   The agreement provided that in the event of her remarriage the benefits would cease.   She remarried but the remarriage was annulled, after it had been determined that her second husband had not been validly divorced from his first wife.

The case comes to this court after trial in which the wife recovered judgment in her favor.   The husband appeals.

The judgment, in our view, should be reversed on the ground that although the wife's remarriage was annulled and is therefore null and void from its inception for many purposes, it was nevertheless, for the purpose of construing the separation agreement under which the wife claims, sufficient to terminate the obligations of the husband under it.

The parties were married in Connecticut in 1927, had two children, and lived together in Connecticut until February, 1944. In March of that year they entered into the separation agreement which is the subject of this action.   It provided for the husband to support the wife and the children, and to maintain certain life insurance for the benefit of the wife.   There is no issue in the case concerning the children, toward whom the husband has faithfully maintained his obligations.

In May, 1944, the wife divorced the husband in Nevada and the financial arrangements were those provided in the agreement executed earlier in the year. In August, 1944, the husband had remarried.

Under the agreement it was provided that the periodic payments and the life insurance for the benefit of the wife should continue " until she shall remarry ".

In 1947, the wife, now divorced, met one George W. Harragan, a married man, who was the brother of the lawyer who had drafted, on her behalf, the separation agreement.

In March or April, 1948, on his brother's advice, Harragan went to Nevada to establish a " residence " for a divorce action against his then wife, Rosalind; but after spending six weeks or two months there he returned to New York. In June, 1948, he started his Nevada divorce action on the ground of his wife's insanity, she then being an inmate of a Massachusetts State hospital.

Harragan returned to New York, told the divorced wife of defendant that he was having some trouble with his divorce, and would have to return to Nevada.

In May, 1949, Harragan and the wife in this action went to Nevada. Harragan obtained the divorce against his first wife and the same day he and defendant's former wife were married. She testified that she was assured by Harragan's brother, the lawyer, that the remarriage would be valid so long as it was performed in the State where the divorce had been obtained.

Harragan and his new wife took up residence together in New York. This marriage lasted two years. In the meantime Harragan's first wife divorced him in New York and obtained alimony from him. Indeed the action was started in 1949 and judgment became final in October, 1950. The ground for the divorce against Harragan was adultery. There was also the finding that there was no outstanding divorce between Harragan and his first wife by a court having jurisdiction, although in his Nevada divorce Harragan served his first wife personally and by publication. (Presumably, the Nevada divorce was determined to be ineffective because of lack of jurisdiction based on Harragan's " residence " in Nevada.) Harragan and his second wife continued to live together. But, in 1951, plaintiff, defendant's former wife and Harragan's second, sought legal advice. This time she obtained her advice from a new lawyer. He told her that her remarriage to Harragan was invalid and could be annulled. He told her further that under a recently enacted law she could obtain alimony from Harragan under a decree of annulment,

but it was hardly worth while to try, because Harragan was already saddled with debts and alimony to his first wife. But, he pointed out, the annulment of the remarriage would revive her rights under the separation agreement with her first husband.

Following this advice, in 1951, defendant's former wife obtained an annulment in this State of her remarriage to Harragan. She did not ask for support under the provisions of section 1140-a of the Civil Practice Act.

Then the claim was made for the resumption of obligations under the separation agreement, and this action was brought.

The fact is that we are not required in this case to construe whether the remarriage was an event valid within the meaning of any statute or of any general rule of law. We are required to construe words used in a written agreement by the parties (*Davis* v. *Welber*, 278 App. Div. 36). They provided in the agreement, written by the wife's lawyer, who masterminded the legal technicalities of the remarriage, that the husband's obligations should cease if she should remarry. She did just that, within the meaning of the agreement. She intended to do just that. Her lawyer intended just that — namely, a marriage valid in Nevada because it was the State of Harragan's divorce. Had the parties at the time of the making of the agreement expressly considered whether a remarriage would have to be valid in all places and under all circumstances and for all purposes and for all time, they would have, vehemently, with one voice, said no. These acts occurred between 1944 and 1949 and the legal confusions engendered by multiple divorce laws and multiple marriages had already confounded many analytical legal minds. No lawyer would draft such an agreement using the phrase " until she shall remarry " and claim that under all circumstances it has a univocal sense.

Now, it is said that the law is clear under the decisions that in this context an annulled remarriage never existed and that therefore the rights of the parties are restored to what they were before the remarriage. Reliance is had on the case of *Sleicher* v. *Sleicher* (251 N. Y. 366), in which Chief Judge Cardozo wrote the opinion for the Court of Appeals. The situation in the *Sleicher* case was very much like that in the case at bar. The parties had entered into a separation agreement providing for periodic benefits for the wife " to continue so long as she remains unmarried ". They were then divorced in Nevada, and the separation agreement was incorporated into

the decree. Thereafter the wife remarried one Hannum. Three years after she obtained an annulment of the remarriage in this State. Up to this point the *Sleicher* case is like ours. But the difference, and a salient one, is that the annulment of the second marriage was on the ground of the second husband's fraudulent concealment prior to, up to and including the time of marriage, of his insanity. Said the court: "A marriage procured by fraud is voidable, not void. Even so, annulment when decreed, puts an end to it from the beginning (*Matter of Moncrief,* 235 N. Y. 390; *American Surety Co.* v. *Conner,* 251 N. Y. 1). It is not dissolved as upon divorce. It is effaced as if it had never been. From then on, payments to either spouse may be demanded and must be made on the footing of its nullity. This is true, according to the holding of some courts, where bequests of income are to be paid until remarriage (*Matter of Wombwell's Settlement,* L. R. [1922] 2 Ch. 298; *Matter of Garnett,* [1905] 74 L. J. [Ch.] 570). It is true and for like reasons where installments of alimony are to be paid under a judgment. A marriage is unreal if procured by force or fraud." (P. 369.)

But Judge CARDOZO went on immediately to say: "The retroactive effect of rescission from the beginning is not, however, without limits, prescribed by policy and justice. These limits are not unknown even in controversies between parties or privies to the rescinded act (*American Surety Co.* v. *Conner, supra*), but they have their typical application to the rights and duties of a stranger. For the stranger, rescission from the beginning is a watchword to be heeded when an act to be thereafter done with reference to one or other of the parties may be governed or affected by the time or quality of the severance." (P. 369.)

With this reasoning we can but agree, but it must be carefully noted that it expresses no verbal fetishism. Implicit is analysis of the situation against the requirements of justice and policy. In the *Sleicher* case the wife had been adjudged the victim of a fraud. In this case, there is involved a void rather than a voidable remarriage, but the wife knew all the facts. She gambled on the law, and lost. Or did she really gamble on the law? Or on the quiescence of Harragan's first wife? Or that Harragan's first wife would not recover her health? Or on Harragan's ability to support more than one wife?

To the annulment of the wife's remarriage the defendant husband in this case was a stranger and "the retroactive effect" of the annulment "is not, however, without limits, prescribed by policy and justice".

Thus it was also Chief Judge CARDOZO who wrote in *American Surety Co.* v. *Conner* (251 N. Y. 1, 9): "The decree of annulment destroyed the marriage from the beginning as a source of rights and duties (*Matter of Moncrief,* 235 N. Y. 390, 397), but it could not obliterate the past and make events unreal. For two years and more this marriage had subsisted; for part of those years, there had been life together as man and wife. Gains there had been and losses beyond the process of appraisal."

The *American Surety Co.* case was not an action between husband and wife, but like the *Sleicher* case, it involved an annulment based on fraud and therefore a voidable rather than a void remarriage; but for the purposes of this case the difference is immaterial. Thus the *American Surety* case, decided earlier in the same year, did not compel a similar result in the *Sleicher* case, because analysis requires more than word-matching.

We note too that in the English cases upon which Judge CARDOZO relied in the *Sleicher* case, and which are cited in the portion of his opinion quoted above, the annulments were granted on the ground of the husband's impotence, a ground of which the wife could have had no prior knowledge and yet be entitled to annulment. But even this becomes precious distinction because these cases turned on the construction of particular instruments providing for settlements in marriages, which marriages were later annulled. This case involves a separation agreement between the husband and wife made consciously and intentionally against the background of a round robin of Nevada divorces and contemplated remarriages. It makes neither sense nor reason nor is it good policy that the husband should stand ever ready to support the wife, insuring her maintenance should she, with full knowledge of the facts, but confused or misled by the vagaries of matrimonial law, discard or be discarded by a second husband because of legal infirmities in the remarriage. Suppose a husband, divorced, and now relieved of duty to support his divorced wife because of her remarriage, himself remarries? Suppose he has children by his second marriage? Suppose he drops the life insurance he had agreed to maintain for the first wife until she remarries? Must he now restore it, if he can, at a higher rate of premium?

Suppose the husband retires from active work once his divorced wife remarries, believing that he has only himself and his children to support?

Of course, the situation presented might be quite different if the wife were liable to become a public charge. Then an innocent stranger, the public, would be involved, and perhaps under such circumstances policy and justice might require resumption of the duty to support. But on that we need not pass. That is not this case.

Both parties agree that Connecticut law governs the facts of this case, if there is any Connecticut law that speaks directly to the problem. There seems to be none. Connecticut law, like that of New York, holds that an annulled marriage is voided from inception. (*Bombard* v. *Bombard,* 6 Conn. Supp. 179; *Tessier* v. *Magee,* 15 Conn. Supp. 342.) That is like the law of New York. But the question in this case is what did the separation agreement contemplate by the term " remarry ", and not what is the status of the parties to an annulled marriage.

The significance of *Sutton* v. *Leib* (342 U. S. 402), relied on by both parties, is that the annulment of the remarriage is entitled to full faith and credit in all the States. What is specifically reserved is the question we are obliged to determine here. Thus, Mr. Justice REED wrote on behalf of the court (p. 409) : " The determination that the New York adjudications must be given full faith and credit in Illinois, however, does not decide this controversy. Although the federal courts must give the same force and effect to the New York decree as Illinois does, a question of state law remains. Does Illinois give the marriage ceremony of an annulled marriage sufficient vitality to release Leib, the respondent, from his obligation to pay alimony subsequently due? ".

We turn now to another aspect of this case. When the *Sleicher* case was decided it was not possible for a wife who had obtained an annulment to obtain support from the husband adjudged a wrongdoer. The principle that a voided marriage was erased legally was without exception in the statute law, except as to the children of the voided marriage. The law has since been changed. Section 1140-a of the Civil Practice Act now authorizes a direction, if justice requires it, for the support of the innocent wife. Hence, the wife in the instant case had the right to apply for support from Harragan. She did not do so because her lawyer advised her that Harragan's economic situation was not adequate to the task of supporting two women, one a divorced wife and the other, one who would obtain an

annulment. So the wife made her choice without let or hindrance of her first husband or the court. We may assume that this was quite agreeable to Harragan, who testified in the wife's annulment action against him as to the circumstances of his brief '' residence '' in Nevada before his divorce from his first wife, and to his uninterrupted employment in New York throughout the period. This but adds to the incongruity of the result which the wife contends is the law and justice to which she is entitled. Clearly, if she had obtained support from Harragan under the statute, none would countenance a claim for double support. Indeed, under the statute she may still seek such relief from Harragan, albeit subject to the court's discretion. Can it be then that a wife may be entitled at her option to support from either of two sources — from either of two men? (Cf. *Yetman* v. *Yetman,* 91 N. Y. S. 2d 512; also *Matter of Foster* v. *American Radiator Co.,* 249 App. Div. 460, 463.) And if she is entitled to support from Harragan, does it not derive from the very ceremonial marriage to him that she asserts is so dead and so null in the law that it is as if it had never been?

Accordingly, the rational view, it is submitted, is that the wife has remarried within the terms of the separation agreement and that having entered into the void marriage with knowledge of all the relevant facts, or at least with ample notice of them, that were subsequently to base the annulment, she may not now assert that the remarriage was not one in the contemplation of the agreement. In so viewing the case the circumstances of the several divorces, the place where they were obtained, and the legal status thereof as known to the parties or on which they were put on notice are all relevant, at least as a matter of practical construction by the parties. So, too, are the circumstances relating to the later Harragan divorce and the ensuing annulment, including the passage of time between the Harragan divorce and the separation between the wife and Harragan. Legal concepts and the mode of the human mind are not so circumscribed that we may not seek to apply justice within reason and law. It is only our language that is sometimes too impoverished for the needs it must satisfy.

The judgment in favor of plaintiff should be reversed and the complaint dismissed.

DORE, J. P. (dissenting). For the reasons stated by the learned Trial Justice and on the authority of *Sleicher* v. *Sleicher* (251 N. Y. 366) I dissent and vote to affirm. In addition this

record shows that defendant knew of the existence of plaintiff's annulment suit before the interlocutory decree became final and could have been made a party to that action had he sought to intervene (*Tafall* v. *Tafall,* 264 App. Div. 542).

CALLAHAN, BOTEIN and BERGAN, JJ., concur with BREITEL, J.; DORE, J. P., dissents in opinion.

Judgment reversed, with costs to the appellant and judgment is directed to be entered in favor of the appellant dismissing the complaint herein, with costs.   [See *post,* p. 862.]